to take up the final case today. Delbert Johnson v. Jeffrey Halstead. We'll hear first from Mr. East. May it please the Court, my name is Kenneth East and I have the honor of representing Jeffrey Halstead, the former Chief of Police of the City of Fort Worth, Texas, who's been sued in this case in his individual capacity. The plaintiff is Delbert Johnson, an African Apollo sergeant of his who committed certain acts against him. He does not implicate Chief Halstead in that conduct. He claims that Stamp made a false accusation against him, but what happened was, he says, the department promptly and fully investigated and cleared him. We're not here to defend Sergeant Stamp, who is not a party to this case for some reason, but he goes on to say that Sergeant Stamp continued a blatant and unrelenting campaign to ruin his career, but he doesn't give us any facts about what that includes, other than to say that Sergeant Stamp harbored the belief that he was not in trouble because of his race. That's all he says about this alleged hostile environment created by Sergeant Stamp. He goes on to say that because of Sergeant Stamp's actions, he filed a complaint in March of 2013. The City of Fort Worth at the time was the 16th largest city in the nation with a police force of over 1,500 people, yet a few months later, Chief Halstead personally met with this complainant to discuss his problems, even though, as the sort of ballyhooed Coleman report suggests and says, that was not the chief's role. He dealt with policy and outside matters. He had his deputy chiefs running the day-to-day affairs of the department, but nonetheless, he took Sergeant Johnson's complaint seriously and met with him. Sergeant Johnson then asked to be transferred out of the traffic division where all of this occurred. He wanted to go to the jail division. He got transferred to a patrol position that he didn't like. Again, Chief Halstead goes out of his way to accommodate Sergeant Johnson and return him to the traffic division where he then said he wanted to go back to. When he gets back to the traffic division he puts in his complaint, he still wasn't treated well, and we get a glimpse, even though we're here on a pleading stage motion and the facts are less important than the law that I'll get to in just a second, in paragraph 14 of the first amended complaint, we get a glimpse of some reality here where the plaintiff says that after he was returned to the traffic division, a different deputy chief approached him and said, I don't care what Chief Halstead said or did, I don't want you back in the truck. Ills befell Sergeant Johnson were not because of Chief Halstead, they were despite Chief Halstead. So we get to the law in this case and this is really an interesting situation where we have a qualified immunity case and a plaintiff who has sort of dug in his heels and said, I don't have to show you what the clearly established law is. And that is despite the repeated pronouncements from the Supreme Court on the subject, this court's Van case from earlier this year which says expressly it's the plaintiff's burden to find a case in his favor and the district court plaintiff cited an area pre-existing or precedential case and that alone dooms this case here. Last week, or week before last, we issued, Fifth Circuit issued another opinion, Bustillos v. El Paso County Hospital District, it's so new I don't have it cited, it's 2018 Westlaw 2338812, again saying the appellant has not carried her burden appointing this panel to any case that shows, in light of the specific context of this case, that the conduct violated clearly established law. In this case the plaintiff's . . . But you agree allowing a hostile work environment to persist violates clearly established law. I understand you're saying your client didn't allow it to persist, but . . . No, I don't agree with that formulation of your statement. Because you think it applies only to sex-based harassment, is that why or what? Tell me. Because . . . It's not your 28-J. Go ahead. Because you have to tailor it to the facts of the case. And I'll give you some concrete explanation as to why that didn't happen here. On page 19 of the plaintiff's brief, and in this case the plaintiff's brief is the district court's opinion. He simply cut and pasted the district court's reasoning into his brief, and so what the district court found is what is being argued on appeal by the appellee. On page 19 he says, it's baffling that we're arguing about clearly established law, and here's why. This is the clearly established law, he says. The Equal Protection Clause of the 14th Amendment prohibits racial discrimination. And he goes on to repeat the same formulation for his three causes of action. Well, that is exactly the formulation that the Supreme Court has rejected. In the Al Kidd case, for example, it said the general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established. Very recently the Tenth Circuit used the exact same language. Sure, it can't be at a high level of generality when we get these cases all the time. We deal with that all the time. It's usually more in a Fourth Amendment-type context. But, so why here, if the Coleman Report sufficiently establishes that there was a hostile work environment based on race, what notice was your client lacking that that's unlawful? The Coleman Report, again, speaks in generalities and unnamed parties, and when it talks about the Department, it says the FWPD, or management in the FWPD, made certain . . . The chain of command. The chain of command. It never isolates Chief Halstead, other than to say in the beginning that Chief Halstead's job was not to deal with day-to-day operations. And in the end it says that Chief Halstead tried to make things right, and then he issued this video to his department saying, look, things have not been the way I want them to be, and I'll accept my share of responsibility, but we're not going to do this going forward. That was a, the buck stops here, admirable thing for Chief Halstead to do. It was in no way a confession of the type of specificity required by a plaintiff to overcome qualified immunity that he ever knew anything in time to do anything about it. If you look . . . Well, at the pleading stage, you need to plead, there was a hostile work environment. I do think, I mean, the Coleman Report repeatedly says things like that. So then the issue becomes, did Halstead, was he indifferent to it? Did he know about it? And that's, and that's where you think there's not sufficient allegations. Right. And again, the Coleman Report's allegations are hard to decipher, and they're mostly conclusions. And at one point he says that this plaintiff, the A party in that complaint, filed a complaint saying that his supervisors were negligent, which is, so they used terms in that Coleman Report that are not applicable. But when you look at the facts that are alleged, the hostile environment is so lacking in any specific allegations to meet our court's hostile environment test, you've got to have a severe, serious, continuous, appropriate barrage of racial problems. And we have here an incident that was a complaint that was investigated, and he was cleared. And then we have Sergeant Stamp making a comment to himself or somebody that . . . The Coleman Report, Johnson was repeatedly subjected to behavior that was hostile, intimidating, and bullying, and it was done publicly over a period of more than three years. But that's completely conclusory terminology. But somebody else . . . After a thorough investigation. I mean, again, we're at the, we're at the pleading stage. Usually at a pleading stage, you don't have an investigation of the defendant's workplace that has a conclusion. I mean, the plaintiff didn't hire those folks. Fort Worth PD did, right? This plaintiff has been ordered to follow Rule 7, Filtia reply, and allege with particularity what it is that Chief Halstead did. And he hasn't come close to meeting that burden. And he hasn't come close to meeting the clearly established law criteria, as I was beginning with. And, and just one more case on that point, Your Honor. Earlier this year, the Tenth Circuit issued the Knopf, K-N-O-P-F, versus Williams case, 884, Fed Third, 939. The language in that case was, it is clearly established that a public employer cannot retaliate against an employee for exercising the First Amendment right to free speech. The court said, that's not clearly good enough. Yet on pages 19 and 20 of this appellee's brief, he says, this is all I have to rely on and this is all I'm going to rely on. And I'm, normally we're here arguing about, well, the cases that plaintiff cites are really not factually on point and they're specific but not to this case. Here, the plaintiff's saying, I don't have to do it and I'm not going to do it. It's just an interesting situation where, for the reasons set forth in Vann and Bustillos alone, this court can say, that's it, there's no, plaintiff hasn't met his burden to overcome qualified immunity. But, moving on to the, the causes of action, there are three causes of action left in this case. One is a hostile work environment and two are retaliation claims. And again, it's not our burden to disprove clearly established law and the Cass v. City of Abilene case makes that very clear that even in a case where the district court never mentioned clearly established law, where the defendant in that case never briefed clearly established law, the Fifth Circuit said, it's still the plaintiff's burden as long as qualified immunity is in the case and they didn't meet their burden. So, in the hostile environment claim, in the 28J letter I submitted on the Fields v. Stephen F. Austin case, the, the district court based the hostile environment claim on the equal protection clause. And the Fifth Circuit has said, we discovered no Fifth Circuit case law holding a Section 1983 claim based on a violation of equal protection rights as opposed to the Title VII claim may be brought for creation of a hostile work environment due to race. So, this court may look at that and say, we think it's a good claim, but it's not a clearly established claim and, and it doesn't defeat Chief Halstead's qualified immunity. What would be the basis for allowing it on sex and not on race? Um, I think the reason, because they, they're looking at the difference between the Title VII claim, which has some level of respondeat superior built into it, versus 1981 claims, versus equal protection claims, and, and the analysis. No, but what I mean is, we have clearly in 1983 saying a, a sex-based hostile work environment is recognizable in 1983 under the Constitution. Race is only more suspect once you're in the world of the Constitution, not in the world of the, right? Race is only more suspect, strict scrutiny as opposed to intermediate scrutiny for sex discrimination. So, why if we've recognized a hostile work environment based on sex, would it not be clear that that also applied to, to race? That's not my, I'm not here to argue that you should or should not hold, make that holding in either. Oh, I, okay, I thought you were saying it's not clearly established you can bring a 1983 claim for a race. Well, I was trying to say, why would it not be clearly, if, in other words, if, the case law says it, if things are obvious. Right, it should be, I force you, all right. Yes. I understand that, except this Court, in the Fields case, expressly said, we can't find a case holding that it's a, an actionable claim. So, that is not clearly established under the qualified immunity law, and you may make that pronouncement in this case, but it doesn't defeat qualified immunity for hostile. I think there, have you looked at the Lauderdale case from 2007? I think that, I think that is one, but, I mean, the case law says what it says, well, but I think that is a 1983 based on race-based hostile work environment. Under the Equal Protection Clause. 1983, I mean, 1983 is only, you're enforcing the Equal Protection Clause under 1983. How else do you get a 1983 race-based claim in? That's the, that's the distinction made in the Fields case. Right. Moving on from there, if I may, the, the Caldwell versus Lozano opinion that I, I cite in my brief defeats any idea that anything that's been pleaded in this case constitutes hostile environment other than the Coleman Report saying, in conclusive returns, something happened, it was hostile, but again, the, the actual facts that are alleged that relate to this plaintiff and what he faced was a complaint that was investigated and a, and a stray comment by a, a coworker that does not rise to the severe and pervasive hostile work environment conditions that this court requires, Your Honor. Finally, on the hostile work environment claim, the supervisory liability prong is, is, is simply not analyzed correctly. The sine qua non to the extent to use another Latin term this morning of the 1983 claim is a personal involvement by the defendant. To shoehorn that into a supervisory liability claim, you have to meet a demanding standard of deliberate indifference, and I don't want to spend more time on that because I'm, I'm short on it, but moving on to the retaliation claims, there was no adverse employment action taken. The transfer was a transfer to a comparable level position. He had the same responsibilities. It, it went from traffic to patrol, which certainly didn't decrease the level of responsibility or prestige or, or room for advancement. He makes none of these allegations. The Brooks, the, the Benningfield v. City of Houston case, I think, addresses that question, and the additional cases I submitted in the 28J Brooks v. Firestone, that this vague claim of having gotten less overtime, which he doesn't talk about other than to say he got less overtime, certainly is not a, a clearly established right according to the Brooks v. Firestone case. And finally, the temporal proximity analysis, which is the only causal link the district court relied on, is insufficient because the Supreme Court has said in the . . . You've said a lot of cases on temporal proximity at summary judgment. This is a pleading stage. You said any cases being thrown out on, on the pleading for the time period being too, not, not short enough, or . . . I mean, usually what evidence is in a pleading of, of the causal link? Well, we have the timing. He filed a complaint in March. He was transferred in September, and in the meantime, in June, he met with the Chief. Even if you count that meeting with the Chief, we're still talking about a three-month time period. No court . . . You say courts can throw cases out at the pleading? Any case, I mean, if it's not within a couple days or a couple weeks, it gets thrown out at the pleading stage? In the qualified immunity, if you don't have clearly established law, and there's no court that's ever held that a three-month, let alone a six-month . . . What case throws out a retaliation claim in qualified immunity or anything else at the pleading stage for not showing a causal link? I think there are plenty, Your Honor. I . . . Can you give me one? I mean, that all comes out when you get into McDonnell-Douglas at the . . . which is a summary judgment tool, not a pleading tool. But this Court has expressly held that the McDonnell-Douglas framework, even though not required at the pleading stage, you do have to plead every element of your cause of action at the pleading stage. But McDonnell-Douglas isn't . . . they're talking about the elements, Swierkiewicz v. Saranba from the . . . It's not a proof case, but it says, despite . . . Swierkiewicz from the Supreme Court says that McDonnell-Douglas is an evidentiary framework, just like the jury is not instructed on McDonnell-Douglas, right? I'm sorry. I'm not saying that you have to plead the . . . Right. You have to plead the elements of your cause of action. Right, right. Before you leave that point, there is no heightened pleading requirement in and of itself for involving qualified immunity. However, where there's a kind of confusion, it goes back to Satya, and that is that what normally happens is that when you have a qualified immunity issue that's raised by the pleadings, the district court can order the plaintiff to reply, to file a reply, and a reply is brought forward under the 1938 rules as a . . . retaining its original common law dimension. So in other words, a reply can require particularized pleading, and that's not captured by the prohibitions against heightened pleading. There is no heightening of the pleading of a reply. A reply requires heightened pleading. It requires particularization. So I don't mean to confuse the issue, but when we're talking about these pleadings, what happens with immunity would be simply that, to protect the vitality of immunity defense, we told the district judges they can require a plaintiff to file a particularized reply to it, and that's not what we're talking about here. Absent that, the pleading is good. In other words, the plaintiff has no obligation to particularize pleading except in order to do so by a reply. It was ordered to do so by a reply. I'm sorry? It was ordered to do so. Well, that's what . . . in those situations, then you have a . . . they have to comply with that, and this is my obtuse way of explaining to you, putting this in context. If it comes to the . . . with a reply that's been ordered, then they are required to plead with particularity, and that's . . . the whole reason for that is to sort out the qualified immunity defense as early as possible. Just to be clear, it was ordered to do that in this case. And we're talking . . . but you're talking about what the plaintiff's pleadings were in the complaint. I understood that. No reply pleading includes . . . Well, I misunderstood you. I thought you were talking about his complaint. I'm talking about . . . You're talking about his reply to the . . . The package of those two things is his pleadings. The complaint and the reply pleading constitute pleadings . . . I wouldn't package them, because it's only the reply that we're talking about. Yes, sir. And I don't think the reply got him any further than the complaint, other than to attach the Coleman Report, which I've already discussed, and I'm over my time, so I'll . . . Okay. I'll return a rebuttal unless . . . All right. Thank you, sir. Thank you, Your Honor. Okay. Please. The Court is reduced. My name is David Watsky. I represent Dilbert Johnson in this case. Judge Costa, you asked Mr. East questions about temporal proximity, and it's ironic that Mr. East did not cite, to your opinion, from 2017, Starnes v. Wallace, although in FLSA retaliation claim case, the issue was temporal proximity, and you basically said that under McDonnell Douglas, you don't need temporal proximity if there's other evidence of retaliation. Temporal . . . So what is your evidence besides the timing to show this was retaliation? Your allegation, because . . . So here's the timeline. 2010, Dilbert Johnson finds a noose in the office at the traffic division. He doesn't complain about it. Some other African American officer complained about it. The other sergeant, Stamp, thought that Dilbert complained about it. And Sergeant Stamp started a harassment campaign against Dilbert Johnson, which included accusing Dilbert of stealing money from a federal grant that the Fort Worth Police Department was using for traffic. Dilbert Johnson had to undergo three different independent audits from both federal and state. All came out clear. And Sergeant Stamp says the only reason he got out of that is because he's black. There . . . But you're alleging retaliation is moving to the night shift. Right, and I'm getting to that. So in March of 13, Dilbert files a complaint with HR. Not the chief, HR. And he alleges pattern and practice of race discrimination, harassment, retaliation, hostile work environment. And in June, June 28 of 13, he meets with Chief. And he tells Chief all about it, and Chief says, I'm going to make it right. And that was June 28 of 13. In September of 13, just less than three months later, he transfers Dilbert from traffic working Monday through Friday, normal days, to the West Patrol Division working 4 p.m. to 2 a.m. Friday through Monday. In traffic division, he was working overtime. No overtime in the transfer job. In traffic, he was able to work a secondary job. No secondary job here, because he wasn't in traffic anymore. I see why you're saying it was worse. So what other than the timing of it are you saying shows that that demotion related to his conversation, or basically his report to HR? And his report to the chief. To Halstead, right. Right. Well, he Let me ask you a question. How long had he been with the police department before that transfer to the night shift? Oh, 20-some odd years. And the answer to your question, Judge Costa, is it's contained in the Schulte reply and as part of the Coleman findings. This is not a case in which, and this is every case that Coleman says this was in retaliation for the complaints? Yes. I mean, we can find it, but if you happen to have it handy. If you don't have it handy, we can go on. Based on the widespread knowledge of the hostile behavior, insufficient actions were taken by members of the chain of command to stop the harassment. That I've seen. It appeared that complainant and the complainant suffered from the failure to act on the part of the department's management as management failed to comply with the department's own code of conducts, general orders, policies on equal employment opportunity, provisions for creating a harassment-free workplace, and state civil service regulations in Title VII. I mean, I saw all this stuff about harassment, I just didn't see that they, I thought you were saying the report says he was sent to night shift to retaliate against him. That's correct, yes. It does say that? No, no, no, I'm sorry. Oh. That's part of other evidence of retaliation. Okay, yeah, okay, okay. Right. Although it did mention that in the report. It is, and it may not be cited in the brief, but it is part of the record. And then, in addition to this, so the Coleman report, hired by the city, independent, finds all of this horrific race discrimination and retaliation within the Fort Worth Police Department. What was it? I mean, it is, they don't really detail what it was. I mean, we know about the initial incident, but what after that? What is going on for the three years? There was another party that was involved, Lieutenant Edney, another African American police employee who was also subjected to severe race discrimination and retaliation. And it was the whole concept of this traffic division was run by this Sergeant Stamp. And what he did, he had a cane, and he was allowed to continue to do these things with no repercussions whatsoever. And to the point of Chief Halstead's involvement, the Coleman report speaks for itself. But Chief Halstead… When did he get there, the Chief? When did the Chief come in? He wasn't there when the Noose incident happened, was he? The timeline is not real clear to me. I don't know the answer to that question, but he was certainly there as of 2012. And so what did he do? Well, here's what he did. No one told him he had to do it, as far as the record shows. My pleadings. He said on a YouTube video that he recorded, he said, It was very apparent within the Coleman report that even I made some very poor judgment decisions, and I apologize to anyone and everyone that I have hurt. A little over a year and a half ago, two of our employees within the traffic division were disrespected and retaliated against simply because of their skin color. It's very egregious. I apologize to both of the affected employees. But saying he had poor judgment doesn't rise to the level of constitutional violation. Relying on the apology too much is a little concerning because you want leaders of organization, when it comes out that there were problems in the organization, to be sympathetic to the victims and to apologize for what happened. And if you turn that into this big piece of evidence against them, the fact that they apologized for what was going on under them, you're going to discourage that kind of attempt to reconcile. Well, I appreciate that concept and I do acknowledge it. However, every single case that has been published to my knowledge, or virtually every, I can't go on and say that, but has a defendant in the face of a retaliation case. A harassment case. A race discrimination case. Absolutely defending their decisions, not just from the time that the decision was made, but all the way to court, to court of appeals. How is your client connected to the transfer of the officer to the night duty? Plainly, that transfer to night duty is a pretty severe transfer. It's certainly adverse, no question about that. But how was he connected to that? How was Chief Halstead? Halstead made that decision. He's the one that made the transfer? Yes. And that's in the pleadings? That's what I'm going to be clear about. Is it normal for the Chief to make that kind of decision as opposed to a supervisor? Is there anything in the record about that? In a big organization, I'm surprised the Chief's worried about putting one person on a different hourly shift. Well, I would argue that that shows the retaliatory nature. Well, right, but is there anything on the record about whether he did, or any allegation, I guess we're not at summary judgment yet, but that he normally didn't make those decisions? This is not a summary judgment case. I have not been able to engage in discovery yet. This is just pleadings, and so we have not developed a record so far. But that bodes to these pleadings need to be liberally construed. Well, you have a police officer who worked there for 20 years, and the police chief personally transfers him, causes him to be transferred to this night shift, which is probably the most unforgiving shift in police work for obvious reasons. Plus weekend. I understand exactly what you're talking about. I'm just puzzled at the same question my colleague has. I think that doesn't strike me as something that a police chief is personally going to do. It's helpful to your cause if that's true, but, I mean, I'm trying to understand that. I thought I'd assume that Stamps was the guy that did this or something of that sort. Stamps was a sergeant just like Dilbert Johnson was a sergeant. Yeah. But by de facto, Stamps had his posse, but Stamps did not make a decision concerning Johnson. It's sort of a cat's paw. It's sort of a cat's paw. The chief did it. They were both the same way. And the Coleman report talks about the transfer and Dilbert's allegations about it. And in the Coleman report, the report says, and the chief does not deny these allegations. He was not. The chief does not deny these allegations in the Coleman report. Yeah. You're moving for a moment to your First Amendment claims. I have a problem with that. That's a bit of a stretch. I'm sorry. Your claims with regard to the First Amendment, you had three different shots at this, and I understand you know the other two, but that one's a bit of a stretch to me. The First Amendment, I would submit, Judge Higginbotham, is just as strong, and here's the reason why. There are numerous cases in which both the Fifth Circuit and even the U.S. Supreme Court talk about protected speech related to both kind of a public concern and a private concern. And there are cases that say that misbehavior in police departments, race discrimination in police departments are all matters of public concern that are protected from First Amendment retaliation. But since Garcetti, you have to show that it's a matter of public concern, but you also have to show what's become more difficult for plaintiffs, that they're speaking as a citizen and not as an employee, because the Supreme Court, right or wrong, is worried that these First Amendment claims are coming up any time there's an employment dispute in the public context. And the law, it seems to me, at most, is mixed. You have to show it's clearly established. How can you show it's clearly established he was complaining about in his capacity as a citizen as opposed to an employee who was wrong? And just like an employee at McDonald's is going to complain if they were wrong. That's the part where it's part private, part public. He's complaining about not only what happened to him, but what is happening in the department itself, which under— Our court said there's two different inquiries. They said, is it a matter of public concern? That's one inquiry. But there's another inquiry. There's a case out of Mississippi where the person was complaining about the sheriff embezzling money. That's clearly a matter of public concern, just like a hostile work environment in a police department. The public's going to care about that. But it has to be done in his capacity as a citizen rather than as an employee. And one of the things we look to is did he report it to the media? Did he report it out here or he didn't? He didn't report it outside, which is more typical of something being done in a protected manner. Look at Connick v. Myers. Just keep it in New Orleans while we're here. District Attorney Connick and the employees. That's the distinction there. One of the things that they did pluck aside, the Supreme Court did raise concerns about, had to do with Ms. Myers' complaints about being a cause to have to support the campaigns and so forth. That was more of a public issue rather than the internal issues itself. But that's the source of this distinction. That's the source of the citizen-employee distinction. In connection with that issue, I would cite. But apply it here. You've got a qualified immunity defense here. This area of the law is less than elusive. So the Thompson v. City of Starkville case, the Fifth Circuit case, in that case the plaintiff complained in writing at first, orally later, about being passed over for promotion. His frustration with not having been allowed to sit for the sergeant's exam. This court recognized that Thompson's speech went beyond his own personal concerns. His complaints dovetailed with other problems within the department that affected his co-workers and the public at large. Widespread misbehavior in the department, as is done here. Political favoritism guiding promotions rather than merit. Well, not promotions in this case. It's demotions. Racial discrimination against others. That Thompson v. City of Starkville case is right on point. And there was no proof in Thompson that they were trying to speak as a private citizen per se. But when it impacts misconduct within the department, that's when the public has a right to become aware of that. Also— Does your First Amendment retaliation claim really add anything that your 1981 retaliation claim for complaining about discrimination doesn't already have? From a technical remedy? From a practical standpoint. Maybe that turns on the remedy. I don't know. I'm not sure, but I think if we win on one, then we wouldn't—if we win on both, we couldn't double the cover. I think it's the same damage, if that answers your question. In Branton v. City of Dallas, this is a First Amendment case. Judge Dennis, you were the author of this opinion, specifically said speech related to improper acts by public officers qualify as a matter of public concern, citing your decision, Judge Higginbotham, Schulte v. Wood, about that same matter. So there's an incredible amount of evidence in this case. Again, this is not a standard, I didn't do it, I didn't do it, I never did anything against you, to their deathbed. This is a finding that was made by basically the city contractor who was hired to look into it. And as a result of that, Halstead— So just tell me, what did Halstead do in response to the hostile work environment that makes him liable? What are his specific actions? I know you've got the report, I know you've got his video. What are his specific actions? So the timeline, the complaint was March of 13 and June of 13. And the harassment continued into September with the transfer. It continued with when Delbert Johnson found a job to get him out of that terrible situation. Wouldn't the transfer remedy—I mean, it maybe creates a retaliation problem, but wouldn't it remedy the hostile work environment if you're taking him away from this situation with this bad guy? Well, the usual thing to do is, a victim of harassment, you go to the victim and say, listen, would you like to go to this shift? That never happened. He was forced to go. And then when he was there, he found an open job. What's your evidence Halstead knew about the hostile environment? The Coleman report. I mean, tell me, what day did someone tell—I understand you have this report, but just tell me the facts that underlie that finding. Who told him? When was he told? In what capacity? Once the complaint was made, he was part of the investigation, and I hate to sound repetitive, but it's all detailed in the Coleman report. So you're basing everything on—I mean, maybe that's enough, but you're hanging your hat on the Coleman. Not just—also the fact that when Delbert Johnson found another job, open position, to get him out of that bad job, he tried to get it, and Halstead quashed the open position. He said, no, close the position down and stay there. And then when finally after the Coleman report came out and Halstead then put him back to traffic, when he announced that he was putting Delbert back to traffic, he basically said that, well, because of the retaliation and race discrimination. Thank you. My time's up. Thank you very much. Thank you, sir. Bruce, you have five minutes on the phone. Okay. Judge Costa, just to briefly answer your question, I would refer you to the Chin v. University of Texas case 836. That third, 467, it distinguishes between the pleading standard in the case where they dismiss the complaint on appeal versus the elements of the Armadestri case and how you deal with that in a pleading case. On the timing of the hostile work environment, read the allegations the plaintiff makes himself. There was this concept of a hostile work environment that revolved stamp. He didn't complain about that until 2013. I think you picked up on that, Judge Costa. Nothing Chief Halstead did is – there's no allegation that Chief Halstead was on notice of anything prior to March 2013. The hostile work environment was contained before that time, and for that reason alone, Chief Halstead cannot be – What is the allegation that the chief who is responsible for this transferred to the – Again, that's distinct from the hostile work environment. It may be, but what do you ask for that? The allegation is that he was – I think he's arguing the wrong timing up here. What's in his complaint is – and what happened was while still in the traffic division, he asked to be transferred to a jail position. He didn't get that transfer, apparently. He was transferred to patrol, and then when he didn't like patrol, Chief Halstead put him back in – and he admits that. That's the last thing the counsel just said. Chief Halstead accommodated him at his request and put him back in the traffic situation where the harassment or alleged problems occurred in the first place. He's not just transferred to patrol. That's a little incomplete about what that transfer was, as is alleged. Well, and just to address that point, if you read the Benfield case, the Brooks v. Firestone case, he was a 20-year employee, but he wasn't transferred to a patrol job. He was still a sergeant. He was transferred to a supervisor. The department needs to fill all shifts with experienced supervisors at all times, and the cases say a change in shift, even tonight's shift, is not enough. Well, the allegation is that it's not just a change in shift. It's the weekend tour, so to speak. It cuts him out of overtime. It cuts him out of – I'm sorry, but that to me is clearly an adverse employment action. If that's the assignment that he got, and that's not just going to patrol, that's giving you the dredges of the department. That's the toughest job out there. And a 20-year patrolman don't do that. But he wasn't a patrolman. He was a supervisor, and he was a supervisor in patrol. And the cases, I understand, they say that's a preference function, and if you're talking about days and hours alone, that's not enough. In the two cases in this circuit where they've ever said – All right, all right. I understand your argument on this. All right. I'm sorry. I think counsel mentioned the noose in saying that his client was a part of that. His client was not a part of that. He wasn't submitting it, but he was told about it, and then somebody else complained about it, and then apparently Stanton blamed him for all that after the fact. But just to clear the record on that. The three audits also, where is the blame in that? There was a complaint filed. Nobody knew whether it was true or not. There was an investigation. It was clear. That is just an isolated incident that does not create a hostile work environment, and that's all that allegation can go to. All these claims are brought against the city, too, and those are just on hold in district court waiting this? Exactly right. This court is the state that's putting this in. And so to affirm this decision, I don't know how you get there without ignoring the holding in the Vann case, in the Bustillos case, and the fact that all the district court and the plaintiff have tried to allege that the clearly established law is at the highest level of generality. Beyond that, there is a case that has not been fleshed out in the district courts yet, and it is the Oden case from this court, 246 F. 3rd, 458, where this court said there is no Section 1981 claim against an official in his individual capacity. That's a complicated case, and the district courts have analyzed it and come to differing conclusions. But a difference among the district courts does not create a clearly established law. And if you read the Oden case, and there's a first circuit… Did you raise that issue in your brief? The burden, again, is on the plaintiff to show what the clearly established law is. We don't have to prove what it is not. Right, but you can't – I know, but the briefing does tee up the issues, and that's the burdens on him. Yes, Your Honor, that was not in my brief. But again, Cass v. City of Abilene, it didn't have to be. It's not my burden. And if you analyze that issue, you may also look at the Button v. City of Boston case, which is a recent first circuit case at 857 F 3rd. But you're not only not putting it in your brief, you're doing a rebuttal, so he has no chance. I mean that's even – I didn't mean to do that, Your Honor. I meant to get through it earlier. But again, it goes along with the overriding proposition that plaintiff has not met his burden to show this court what the clearly established law is. And again, the temporal proximity argument that counsel tried to make I don't think changes the analysis. It's never been held that a six-month, even three-month period is enough to get there, and there is no other basis in the district court opinion or in the briefing on this case to support the causal link. On the retaliation claims, I agree with the analysis about the First Amendment. It was a – and last thing on that, you mentioned the Garcetti opinion. The Lane opinion came after that, but the facts in this case came before the Lane opinion. And in Lane they said Garcetti made a mess, and the law was not clearly established. Lane tried to clear it up somewhat, but afforded that defendant qualified immunity. My time is up. Thank you, Your Honors. Thank you. In case you want to take an item, this panel will adjourn until 9 o'clock tomorrow morning.